UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

HANY BADAWY,                                      04 Civ. 01619 (RJH)

                Plaintiff,

      -against-                                **MEMORANDUM OPINION
                                        AND ORDER**

FIRST RELIANCE STANDARD
LIFE INSURANCE COMPANY


                Defendant.

-------------------------------------------------------------x


Plaintiff Hany Badawy ("Mr. Badawy") brings this action, pursuant to the Employment

Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et seq*., alleging that the

defendant First Reliance Standard Life Insurance Company ("First Reliance Standard")

improperly denied his claim for long-term disability benefits.  Mr. Badawy has filed a

motion for summary judgment; in its reply papers, First Reliance Standard requests

summary judgment be entered in its favor.  For the following reasons, both motions are

denied, and this matter is remanded to First Reliance Standard for a determination in

accordance with this opinion.


**BACKGROUND**

      The following facts are taken from the Administrative Record ("AR") in this

matter, and, unless otherwise noted, are not rebutted or disputed.  Mr. Badawy was first

diagnosed with Familial Mediterranean Fever (FMF) in 1994. (AR 188, 212.)  This

inherited disorder is "characterized by recurrent fever and inflammation, often involving

the abdomen or the lung." *See* National Library of Medicine and National Institute of

Health, Medline Plus Medical Encyclopedia, Familial Mediterranean Fever, *available at*

http://www.nlm.nih.gov/medlineplus/ency/article/000363.htm.[1]  His symptoms of this

condition reportedly began in the 1970s, when he began to suffer sudden and episodic

attacks of high fever, abdominal pain and vomiting.  (AR 212.)  It does not appear,

however, that this condition precluded his full-time employment at any time prior to his

application for disability in 2000.

Beginning in April 1995, Mr. Badawy was a manager at Marshall-Lasser, Inc.,

and continued on as the "Managing Director of Forward Foreign Exchange" when his

company merged with Liberty Brokerage Investment, Inc. in January 1999.  (AR 376.)

During this period, he was hospitalized once, on September 29-30, 1999 at Valley

Hospital in Ridgewood, New Jersey, apparently for "care and treatment for the diagnosis

of Familial Mediterranean Fever."  (AR 276, ¶ 6; AR 302-15.)  Following a subsequent

merger of Liberty with Tradition (North America) Inc. ("Tradition"), Mr. Badawy was

hired as Tradition's "Director of Foreign Forward Exchange," beginning November 1,

1999.  (*Id*.)  Upon his employment at Tradition, Mr. Badawy became enrolled in

Tradition's long-term disability benefit plan.  (AR 320-24.)  First Reliance Standard

insured this plan under Policy number LSC 100326 (the "Plan"), which appears in the

Administrative Record at AR 5-23.

---

[1] The Administrative Record contains apparently erroneous photocopied information on
infectious brucellosis, or Mediterranean Fever, a different disease, that appeared in Mr.
Badawy's claim application.  (AR 380-81.)

Mr. Badawy's last day of work at Tradition was January 28, 2000. His application for long-term disability benefits, dated February 28, 2000 and date-stamped by First Reliance Standard on May 5, 2000, consists of forms submitted by his employer, his physician, and himself. In his portion of the application, Mr. Badawy indicated that January 28, 2000 was the last full day he worked "before his disability" and that, before he stopped working, his condition did not require him to change his job or the way he did his job; he also listed that date as the date he was first unable to work on a full-time basis. (AR 366.)

When asked to detail his job duties and list the physical and mental requirements, Mr. Badawy noted that he "worked 12-14 hours a day, five days a week … I have to entertain clients at nights and on weekends. Frequent travel to Europe and South America. Standing and walking all day from one department to another." He indicated that his position involved a lot of "tension, stress and pressure," as he oversaw thirty staff members, and was in an environment where "constant yelling and screaming occurs during every busy moment in order to execute business as a broker." (AR 382.)

In response to the application question, "Why are you unable to work?" Mr. Badawy explained that he was "unable to perform" his "duties as a manager." (AR 382.) His attacks, with symptoms of abdominal pain, fever, joint pain, difficulty breathing, diarrhea, aching bones, and vomiting, were occurring "more often," and he could no longer "stay at work for a full day." (AR 382.) Some days, Mr. Badawy apparently could not get out of bed, and, on others, he could not leave the house. (*Id*.) Mr. Badawy further submitted that he left Tradition because he could not work any longer due to "Chronic, Acute painful Abdominal Attacks, Weakness, Fatigue, Chest Pain" as well as "Slow

Recovery periods after Frequent Attacks." (*Id.*)  He checked "no" when asked whether he expected he would be able to return to work on either a part-time or full-time basis.  (AR 366.)

On the same application for benefits, however, the Human Resources Manager at Mr. Badawy's employer, Lyudmila Fayman, reported that plaintiff's last day was January 28, 2000 because he was laid off, and not because of the onset of disability.  (AR 364.) According to First Reliance Standard's notes from a telephone interview between Ms. Fayman and a First Reliance Standard employee in November 2000, "she confirmed that [Mr. Badawy] was laid off for cause and his ceasing work had nothing to do with w/ disability, per the Co." (AR 262.)  In a letter, Ms. Fayman declined to comment further on whether Mr. Badawy was laid off for cause, upon the advice of counsel. (AR 258.)  In a section in his reply brief entitled "Plaintiff was not discharged," Mr. Badawy appears to dispute that he was in fact terminated from his position at Tradition, or at least questions the sufficiency of the evidence First Reliance Standard has that he was terminated. (Plaintiff's Reply Memorandum of Law In Support of his Motion for Summary Judgment ("P. Reply Mem."), pp. 6-9.)

Ms. Fayman's portion of the application indicated that Mr. Badawy's condition caused no changes to his job responsibilities before he claimed disability.  (AR 364.)  She noted that the physical requirements of plaintiff's position demanded continuous standing and occasional walking and sitting. (AR 362.)  Contrary to Mr. Badawy's report, when asked if plaintiff was required to travel, Ms. Fayman responded "no." (AR 362).

In the physician's portion of Mr. Badawy's application for benefits, Alan Hecht, M.D., completed an undated statement, noting that he had been caring for Mr. Badawy

since 1994, and that his primary diagnosis was FMF, featuring symptoms that included "abdominal pain, diffuse musculoskeletal and joint pain, [and] nausea and vomiting, diarrhea, [and] fever." (AR 378.)  He noted, and the records support, that Mr. Badawy visited his office about once a year. (*Id.*)  Dr. Hecht indicated Mr. Badawy was prescribed 0.6 milligrams, twice daily, of Colchicine, a medication "used to both prevent acute attacks of FMF and treat acute attacks."[2] (*Id.*)  Dr. Hecht, in commenting on Mr. Badawy's restrictions and limitations, noted that he had "near total incapacitation with attacks of few day [sic] duration several times monthly." (AR 379.)  He considered his patient to have a "permanent condition / disability."  (*Id.*)

Upon receipt of Mr. Badawy's application and review of his medical records which indicated that plaintiff had a long history of FMF, First Reliance Standard initially notified Mr. Badawy that his claim could not be approved because of a Plan provision which precludes benefits for pre-existing conditions. (AR 276-77.)  Following notification from Mr. Badawy's attorney that the provision did not apply to his client (AR 265-66), First Reliance Standard reviewed and reversed its decision in January 2001, because Mr. Badawy had been covered under the long-term disability policy in effect before his former employer was acquired by Tradition, Inc. (AR 236-37.)

First Reliance Standard then reviewed Mr. Badawy's claim on its merits.  Bozena M. Irish, R.N. examined Mr. Badawy's medical records.  These included Dr. Hecht's notes on office visits from 1994 until February of 2000 (AR 331-48); a February 27, 2000 letter to Mr. Badawy from Avi Livneh, M.D. of the Heller Institute of Medical Research in Tel Aviv, Israel (which appears to be a response to general inquires on developments

---

[2] This definition is taken from a report prepared by a physician during First Reliance Standard's review of Mr. Badawy's claim.  (AR 153.)

in FMF study, its treatment and its inheritability) (AR 201); and an October 6, 2000 report and accompanying records from Mark D. Horowitz, M.D., a doctor to whom Dr. Hecht apparently gave Mr. Badawy a referral. (AR 190-200,[3] 202-04.) Upon examining these records, Ms. Irish indicated in her report of March 12, 2001 that "there was no documentation available on file reflecting that [Mr. Badawy] has frequent and ongoing attacks"— she noted that the only evidence of an "acute process" were December 2000 lab reports showing "elevated ESR and C-reactive protein," and that the five documented visits Mr. Badawy made to his physicians in 2000 and 2001 had no record of fever (the "cardinal manifestation" of FMF),[4] no joint pain, and only mild abdominal tenderness (AR 187.) She concluded that, on the basis of the records and the fact he was taking Colchicine prophylactically, Mr. Badawy was "free of any debilitation [sic] intervals between" acute attacks of FMF. (*Id.*)

First Reliance Standard wrote to Mr. Badawy to deny his claim on March 14, 2001, on the grounds that he had "not satisfied the policy definition of Total Disability as defined in the policy." (AR 183-84.) Examiner Robert Rose referenced the lack of documentation of frequent and ongoing attacks that Ms. Irish noted in her report, despite Dr. Hecht's description of Mr. Badawy's "near total incapacitation with attacks," and Mr. Badawy's visit to Dr. Hecht in February of 2000 showed "normal lab results except for elevated cholesterol and LDL." (*Id.*) Mr. Rose informed Mr. Badawy that he should "be aware that our determination regarding whether you meet the policy's definition of Total

---

[3] Plaintiff's Memorandum of Law ("P. Mem.") describes AR 190-93 as part of Dr. Hecht's records (P. Mem. at 4-5.), but they actually appear to be Dr. Horowitz's records, forwarded to Reliance Life Standard by Dr. Hecht.

[4] Plaintiff does not appear to dispute the point that the appearance of fever is central to a diagnosis of FMF.

Disability is, and must be, based on the objective documentation in your claim file. We have no basis on which to measure subjective complaints or medical opinions that are not substantiated by objective medical findings." (*Id.*)

Mr. Badawy's attorney wrote to request an appeal of this determination on March 19, 2001. (AR 166-67.) Thereafter, William Scott Hauptman, M.D. undertook a second review of Mr. Badawy's records. In addition to the materials reviewed by Ms. Irish, Dr. Hauptman reviewed the medical records relating to Mr. Badawy's September 29, 1999 hospitalization (AR 302-15); additional records from Dr. Horowitz, including a March 21, 2001 report which notes that "9-10 days of each month he is immobile and incapacitated due to pain and fever," and that "his laboratory evaluation shows very high inflammation markers" (AR 169-174, AR 176-81); and, the April 9, 2001 report of Lloyd Ross, PhD, Mr. Badawy's psychotherapist, who notes Mr. Badawy's diagnosis of posttraumatic stress disorder, depressive disorder, panic disorder, and intermittent explosive disorder and finds that these disorders are linked to the debilitating attacks of FMF he suffers (AR 163).

Dr. Hauptman issued a report recommending that the claim be denied on October 19, 2001. (AR 153-58.) He concluded that "the diagnosis of [FMF] is not demonstrated definitively in the currently available medical records." He could not find any documentation of any specific incident of elevated temperature in Mr. Badawy's records, despite the fact that "the clinical diagnosis of FMF required the documentation of fever," and indicated that the December 2000 lab work that was "consistent with an underlying inflammatory process" was not specific for FMF. (AR 156.) He challenged Mr.

Badawy's compliance with the recommended dosage of Colchicine,[5] and also noted that the frequency of the indicated attacks has "likewise not been determined definitively," and that, in any event, "patients with FMF do not have symptoms and would not be impaired [in between attacks].  (AR 157.)

On October 19, 2001, the same date as Dr. Hauptman's report, a First Reliance Standard employee apparently called Mr. Badawy's attorney to notify him that the claim would be denied.  (AR 152.)  During the conversation, Mr. Badawy's attorney, Christopher Latham, and First Reliance Standard appear to have agreed that a final determination would wait pending the submission of additional medical documentation. (*Id.*)  Mr. Latham then forwarded to First Reliance the following materials: a December 14, 2001 letter from Dr. Horowitz that noted Mr. Badawy's "almost monthly" attacks of acute abdominal pain and fever requiring management with Colchicine and Percocet (AR 138); records from Mr. Badawy's November 21, 2001 visit to the emergency room at Valley Hospital in Ridgewood, New Jersey for severe chest pain (AR 140-48); and, an additional letter dated November 30, 2001 from Dr. Ross, Mr. Badawy's psychotherapist, commenting that he "finds himself in extreme pain and helplessness during approximately 1/3 to 1/2 of his waking life."  (AR 149.)

Consideration of this additional material did not change Dr. Hauptman's determination.  He again noted that Mr. Badawy's Colchicine dosage is "substandard," and that the frequency of his attacks was at most once a month, as per the December 14, 2001 letter from Dr. Horowitz which references "almost monthly" attacks.  Dr. Hauptman also noted that while Dr. Horowitz's letter comments that fever accompanies

---

[5] The issue of Mr. Badawy's Colchicine dosage is discussed in more detail *infra* note 7.

Mr. Badawy's attacks, there is no instance of a recorded fever in Mr. Badawy's medical records; Mr. Badawy was "specifically document[ed as] afebrile" during his November 2001 visit to the emergency room. (AR 135, *see also* AR 140.) Dr. Hauptman issued a second report, dated January 22, 2002, continuing to recommend the claim be denied. (AR 135-36.)

Another telephone conversation ensued that same day between Mr. Latham and a First Reliance Standard employee, notifying him that the additional records had been reviewed and "peer review still finds no support for claim of TD." Again, First Reliance Standard agreed to await the submission of additional information before rendering a decision. (AR 134.) Mr. Badawy submitted additional materials in support of the claim, including: a Fully Favorable Social Security Disability ruling by the Honorable Christopher P. Lee, U.S. Administrative Law Judge, dated April 22, 2002 (AR 119-28); additional records from visits to Valley Hospital on May 24, 2002 and May 31, 2003 to June 3, 2003 (AR 62-91); the statements of ten family members and friends attesting to Mr. Badawy's suffering (AR 91-104); and a December 31, 2002 vocational report by vocational expert Andrew J. Pasternak, M.A., CRC, finding that plaintiff "is not able to perform at competitive levels for any full-time work, much less something at the skilled level of his former position." (AR 107-13.)

Upon reviewing this material, Dr. Hauptman issued a third report, dated July 2, 2003, again noting the "underdosing of Colchicine" and the lack of fever documentation. (AR 53-58.) While Mr. Badawy's May 24, 2002 visit appears to have been in response to limb pain following a "fall down stairs," unrelated to his FMF (AR 79), the records from his May 31, 2002 visit indicate "Familial Mediterranean Fever, Abdominal Pain" as

the reason for his admission. (AR 62.) Dr. Hauptman's third report pointed out that "while the patient noted fever for two or three days, temperature noted was only 99.2. This is not consistent with the increased elevation of temperature expected in the throes of an acute attack of FMF." (AR 55, *see also* AR 63 (Valley Hospital physician notes recording Mr. Badawy's symptoms leading up to his visit), AR 64 (noting temperature of 99.2 degrees).) Dr. Hauptman also suggested that Mr. Badawy's impairment might be primarily psychiatric, and that perhaps a "psychiatric peer review" would be in order. (AR 57.) In a report issued August 6, 2003, David E. Lembach, a vocational consultant for First Reliance Standard reviewed and criticized the Pasternak vocational report, concluding that the ten minutes of vocational testing, the assessment of his own condition that Mr. Badawy gave Mr. Pasternak, and Mr. Pasternak's general observations of Mr. Badawy were not sufficient to find that Mr. Badawy was unable to "perform at competitive levels for any full time work." (AR 42, *quoting* AR 113.)

In a letter dated August 8, 2003, First Reliance Standard informed Mr. Badawy's attorney that his claim would be denied. (AR 34-38.) The letter noted that Mr. Badawy's employer indicated that Mr. Badawy's work stoppage was the result of a lay-off, which contradicted Mr. Badawy's submission that he left work due to his disability. (*Id.*) The letter also referenced Dr. Hauptman's conclusions that the severity and frequency of Mr. Badawy's FMF attacks as alleged could not be documented, especially in light of the "underdosing" of Colchicine and the lack of recorded instances of fever, as well as: Mr. Lembach's conclusions about the weakness of Mr. Pasternak's vocational analysis; the lack of evidence of psychological impairment, or at least of psychological impairment in the early part of 2000; the fact that, despite Mr. Badawy's self-reporting and his

physicians' statements regarding a higher frequency of attacks, the medical documentation suggested only that the client suffered "up to one bout of gastrointestinal problems a month"; and, the fact that a favorable determination of disability benefits by the Social Security Administration does not guarantee the receipt of benefits under the Plan. (*Id.*) This action was filed in state court thereafter, and removed to this Court.

**STANDARD OF REVIEW**

District courts are empowered to review a challenged denial of benefits under 29 U.S.C. § 1132(a)(1)(B), the ERISA provision that permits the beneficiary of an employee benefit plan to commence a civil lawsuit in order to "recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). A district court will review a denial of benefits under ERISA using "a *de novo* standard unless the benefit plan expressly gives the plan administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the plan's terms, in which cases a deferential standard of review is appropriate." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 102 (1989). This deferential standard is known as the "arbitrary and capricious" standard of review, and "constitutes the least demanding form of judicial review of administrative action." *Snyder v. First Unum Life Ins. Co*., 2004 WL 1784334, at *3 (W.D.N.Y. 2004) (internal quotations omitted).

The parties here do not dispute that First Reliance Standard has adequately reserved such discretion to itself,[6] nor do they dispute that First Reliance Standard operates as both the claims reviewer and claims payor, producing an inherent conflict of interest in that the same entity responsible for deciding benefits eligibility will likewise be responsible for paying out those benefits. The existence of this dual role, "although a factor to be weighed in determining whether there has been an abuse of discretion, is alone insufficient as a matter of law to trigger stricter review." *Pulvers v. First Unum Life Ins. Co.*, 210 F.3d 89, 92 (2d Cir. 2000) (internal citations omitted). The plaintiff has the burden, in such cases, of showing that the decisionmaker was "*in fact* influenced by the conflict of interest" in order to trigger a *de novo* standard of review. *Pulvers*, 210 F.3d at 92.

In support of a finding that First Reliance Standard was in fact influenced by its dual role, Mr. Badawy points to the initial mistaken denial of benefits on the grounds of a pre-existing condition as a "rush to judgment" (P. Reply Mem., p.14); the fact that First Reliance Standard's first denial was based on the review of the records by a registered nurse and not a doctor (*Id.* at 15); alleged failures of First Reliance Standard to request additional medical information from Mr. Badawy, or to examine him (*Id.* at 16-17); the use of a vocational expert to review the vocational report submitted by Mr. Badawy (*Id.*);

---

[6] The discretion-reserving clause reads as follows: "First Reliance Standard Life Insurance Company shall serve as the claims review fiduciary with respect to the insurance policy and the Plan. The claims review fiduciary has the discretionary authority to interpret the Plan and the insurance policy and to determine eligibility for benefits. Decisions by the claims review fiduciary shall be complete, final and binding on all parties." (AR 11.) *See Kinstler v. First Reliance Standard Life Ins. Co.,* 181 F.3d 243, 252 (2d Cir. 1999) (noting that "insulation from *de novo* review" requires the clear establishment of discretion via "either language stating that the award of benefits is within the discretion of the plan administrator or language that is plainly the functional equivalent of such wording.")

and, First Reliance Standard's "mischaracterization of the evidence." (*Id.*)  However, these facts as proffered by Mr. Badawy go to the merits of First Reliance Standard's review and denial itself, and do not support a finding that First Reliance Standard was influenced in fact by the conflict of interest.  *See, e.g.*, *Mood v. Prudential Ins. Co. of America*, 379 F.Supp.2d 267, 280-81 (E.D.N.Y. 2005) (Weinstein, J.) (failure of plan decisionmaker to credit plaintiff's physicians did not create "evidence of a conflict of interest that would itself authorize application of the *de novo* standard"); *see also DeFelice v. Am. Int'l Life Assur. Co. of N.Y.*, 112 F.3d 61, 66 n.3 (2d Cir. 1997) (noting how, under current law of this Circuit, plaintiffs' burden of "expressly explain[ing] how the conflict affected the reasonableness of the interpretation" is a very difficult one to meet); *Owen v. Wade Lupe Const. Co., Inc.*, 325 F.Supp.2d 146, 152 (N.D.N.Y. 2004) ("Aside from speculation, plaintiff can point to no evidence that the conflict of interest in fact affected [the] decision … [T]he Second Circuit has … recognized that demonstrating the in fact showing will almost always be an insurmountable hurdle for plaintiffs, short of irrefutable evidence that the Administrator has stated, 'In view of [my] conflict, this interpretation is adopted.'") (internal quotations omitted, and borrowing language from *DeFelice*).

 Moreover, the record here shows that Mr. Badawy's attorney and First Reliance Standard regularly communicated over the submission of additional medical evidence to support the claim, (AR 134, 152), and the parties do not dispute First Reliance Standard's willingness to accept and review the periodic submission of additional medical evidence during the approximately two and one-half years that First Reliance Standard reviewed Mr. Badawy's claim, as well as its willingness to postpone final determinations pending

the receipt of such evidence. (*Id.*) Such a course of conduct is inconsistent with plaintiff's claim that First Reliance Standard "rushed to judgment" (P. Mem at 14-16), and thus was biased in fact against a finding that Mr. Badawy was eligible to receive benefits. Therefore, rather than ignoring First Reliance Standard's findings and examining Mr. Badawy's claims *de novo*, this Court will apply the more deferential arbitrary and capricious standard of review in examining the denial of benefits here. In the application of that standard, however, the Court will weigh the inherent conflict here as a "facto[r] in determining whether there has been an abuse of discretion.'" *Sullivan v. LTV Aerospace and Defense Co.*, 82 F.3d 1251, 1255 (2d Cir. 1996) (quoting *Firestone*, 489 U.S. at 115).

A district court employing the arbitrary and capricious standard while examining ERISA decisions may not "substitute [its] own judgment for that of the plan administrator as if [it] were considering the issue of eligibility anew." *Celardo v. GNY Auto. Dealers Health & Welfare Trust*, 318 F.3d 142, 146 (2d Cir. 2003). However, "[a]lthough the standard is deferential, if the plan administrator's interpretation of the plan is erroneous, federal courts are not without power to reverse the administrator's decision to deny benefits." *Eastman Kodak Co. v. Bayer Corp.*, 369 F.Supp.2d 473, 481 (S.D.N.Y., 2005) (Cederbaum, J.). Rather, a district court may reverse or vacate a coverage decision "if it is without reason, unsupported by substantial evidence, or erroneous as a matter of law." *See Burke v. Kodak Ret. Income Plan*, 336 F.3d 103, 110 (2d Cir. 2003).

Application of this deferential standard depends on whether coverage is denied based on the factual record or based upon an interpretation of the plan. Where coverage

denial is based upon the conclusion that the medical evidence does not establish the plan member's disability, the issue is whether the decision was unreasonable in that it was unsupported by substantial evidence. Substantial evidence, in this context, refers to "such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the decisionmaker and ... requires more than a scintilla but less than a preponderance" of evidence. *Miller v. United Welfare Fund*, 72 F.3d 1066, 1072 (2d Cir. 1995). Such a narrow scope of review prevents courts from "substituting their own judgment for that of the administrator." *Cook v. New York Times Co. Long-Term Disability Plan*, 2004 WL 203111 at *3 (S.D.N.Y., 2004) (Lynch, J.).

Where coverage is denied based upon the decisionmaker's interpretation of the plan, the issue is whether this interpretation was unreasonable in that it was erroneous as a matter of law. Where both the plan decisionmaker and the claimant "offer rational, though conflicting, interpretations of plan provisions, the [decisionmaker's] interpretation must be allowed to control" under the deferential standard of review applicable here. *Celardo*, 318 F.3d at 146 (citation omitted).[7] However, "deference cannot be so broad as to permit [fiduciaries] to graft additional requirements onto unambiguous plan definitions." *Gallo v. Madera*, 136 F.3d 326, 330 (2d Cir. 1998). A plan decisionmaker's actions may be found to be arbitrary and capricious where it "impose[s] a standard not required by the plan's provisions, or interpret[s] the plan in a manner inconsistent with its plain words, or by [its] interpretation render[s] some provisions of the plan superfluous."

---

[7] The rule of *contra proferentem* will not apply under the arbitrary and capricious standard of review here. The rule, which holds that an ambiguous term in a contract will be construed against its drafter, will apply "to interpretation of Plan terms only under *de novo* review." *I.V. Services of America, Inc. v. Trustees of American Consulting Engineers Council Ins. Trust Fund*, 136 F.3d 114, 122 n7 (2d Cir. 1998).

*Id.* at 330-31; *see also Novella v. Westchester County*, 2004 WL 1752820 at *3 (S.D.N.Y. 2004) (Mukasey, J.) ("The plan administrators acted in an arbitrary and capricious manner … because their decision was based on an interpretation of the Westchester Plan that is inconsistent with the plain words of that Plan."); *Lee v. Paul Revere Life Ins. Co.*, 2004 WL 1630489, at *7 (E.D.N.Y. 2004) (holding that insurance company's "interpretation of the Plan is unreasonable, as it ignores the language and structure of the Plan.").

**DISCUSSION**

Plaintiff proffers two arguments why the defendants' denial of benefits was arbitrary and capricious. First, Mr. Badawy contends that First Reliance ignored a great deal of evidence that he was "totally disabled" in that he was unable to perform the material duties of his job. (P. Mem. at 19, *passim*). In the alternative, plaintiff contends that he was at least "partially disabled" and that, under the explicit terms of the Plan, a partially disabled employee is the equivalent of, and entitled to, the same benefits as an employee with a total disability. (P. Rep. Mem. at 1-2, 4). The first argument turns primarily on the factual question of whether there was substantial evidence in the Administrative Record to support the insurer's determination. *Miller*, 72 F.3d at 1072. The second argument turns on an issue of the proper interpretation of the Plan's language. The Administrative Record is silent as to whether plaintiff is partially disabled, under the terms of the Plan. Defendant's counsel argues that plaintiff's condition does not cause him to fall within the definition of the term "partially disabled." Even if plaintiff were partially disabled, defendant contends that the Plan does not

provide coverage for partial disability other than in limited situations not present here. (*See* Defendant's Sur-Reply ("D. Sur-Reply"), pp. 3-4.) The Court will consider these issues *seriatim*.

### A. Total Disability

As discussed *supra,* under the arbitrary and capricious standard of review, this Court cannot disturb the plan fidiciary's decisionmaking unless it is the result of "clear error of judgment." *Jordan v. Retirement Comm. of Rensselaer Polytechnic Inst*., 46 F.3d 1264, 1271 (2d Cir. 1995). To overturn First Reliance Standard's finding that Mr. Badawy was not totally disabled, this Court would need to find that the Record here lacks "such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the decisionmaker." *Miller*, 72 F.3d at 1072. The portion of the total disability definitional clause that Mr. Badawy was held to fail to meet reads: "'Totally Disabled' and 'Total Disability' mean, that as a result of an Injury or Sickness, during the Elimination Period and thereafter an insured cannot perform the material duties of his/her regular occupation." (AR 8).

The Record in this matter contains adequate evidence to support First Reliance Standard's determination that Mr. Badawy was not totally disabled. First Reliance Standard had evidence that, according to reports from his employer, Mr. Badawy's work stoppage was the result of a lay-off and unrelated to disability. (AR 258, 262, 364.) Mr. Badawy himself indicated that his attacks did not disrupt the manner in which he performed his job prior to January 28, 2000. (AR 366.) Dr. Hauptman's repeated review of Mr. Badawy's medical records found no objective documentation of the frequency of

his attacks as occurring more often than once a month, such as regular blood tests establishing frequent inflammation or recorded instances of elevated temperature. (*See, e.g,* AR 157.) Dr. Hauptman also noted that the Administrative Law Judge who handled Mr. Badawy's claim found he retained a "residual functional capacity … for light work." (AR 53.)

While one of the bases for Dr. Hauptman's dispute with the severity of Mr. Badawy's condition is somewhat puzzling,[8] his general finding that the severity of Mr. Badawy's attacks could not be established appears to have been reasonable considering the lack of objective documentation of these attacks and the fact that First Reliance Standard gave Mr. Badawy and his attorney ample opportunities to supplement the record with further medical evidence as they processed his claim. None of the three hospitalizations Mr. Badawy experienced as a result of his FMF, in September 1999,[9]

---

[8] Throughout his three reports, Dr. Hauptman repeatedly focuses on the letter from Dr. Livneh as evidence of "noncompliance" with the "recommended dosage" of 0.6mg three times daily of Colchicine, and suggests that this noncompliance is at odds with the alleged severity of Mr. Badawy's attacks. However, Dr. Livneh's letter appears to be simply a response to general inquires on developments in FMF study, its treatment and its inheritability. It is obvious that letter was addressed directly to Mr. Badawy, not to his treating physicians, and is merely generalized advice. Mr. Badawy is not a doctor, nor is he responsible for his own treatment. To repeatedly point to Mr. Badawy's "noncompliance" with the dosage Dr. Livneh generally recommends as advisable for patients with FMF as evidence indicative of the lack of severity of his illness is odd on its face when to comply would contravene the advice of his treating physicians. (*See* AR 138 (December 14, 2001 letter from Mr. Badawy's physician noting a dosage of Colchicine twice daily).) Furthermore, Mr. Pasternak's vocational report notes that Mr. Badawy's medicine is increased to "four times a day during severe attacks." (AR 109.) The apparent inadequacy of Dr. Hauptman's reasoning on this one point, however, is insufficient to undermine the overall reasonableness of the "conclusion reached by the decisionmaker" here. *Miller*, 72 F.3d at 1072.

[9] It is noted that, upon their initial review of his claim, First Reliance Standard did not dispute that Mr. Badawy was accurately diagnosed with FMF, pointing to his September 1999 hospitalization for "care and treatment for the diagnosis of Familial Mediterranean

November 2001, and May 2003, produced records of fever. (AR 302-15, 140-48, 62-78). Moreover, the March 14, 2001 pre-appeal denial letter from Mr. Rose alerted Mr. Badawy to the fact that the "determination regarding whether you meet the policy's definition of Total Disability is, and must be, based on the objective documentation in your claim file. We have no basis on which to measure subjective complaints or medical opinions that are not substantiated by objective medical findings." (AR 183.)

Furthermore, a review of the medical records could not objectively establish the frequency of Mr. Badawy's attacks, or any upswing in the number of attacks, in the early part of 2000, although it appears Mr. Badawy reported to Dr. Hecht that his attacks were "getting worse" during a visit on February 2, 2000. (AR 332.) It is also true Dr. Hecht indicated on the benefits application that Mr. Badawy experienced "near total incapacitation with attacks of few day [sic] duration several times monthly," and that, by March 2, 2001, Dr. Horowitz was commenting that Mr. Badawy's attacks were rendering him "immobile and incapacitated due to pain and fever" nine to ten days per month. However, there are inconsistent statements in the record by both Dr. Hecht and Dr. Horowitz that the incidence of attacks was once a month at worst (AR 332, 138.) The fact that at certain points Mr. Badawy's physicians considered his attacks to be more frequent or more incapacitating does not mean that First Reliance Standard's decisionmaking here was arbitrary and capricious when objective evidence could not support these conclusions. *See, e.g., Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 825 (2003) ("[P]lan administrators are not obliged to accord special deference to the opinions of treating physicians."); *Pava v. Hartford Life and Accident Insurance Co.,*

---

Fever in their initial letter denying coverage on the basis of a pre-existing condition. (AR 276.)

2005 WL 2039192 at *11 (E.D.N.Y., 2005) (Townes, J.) ("A decision to deny ERISA benefits is neither arbitrary or capricious where it is essentially a decision to value the opinion of its independent physician [upon review of claimant's records] above the opinion of Plaintiff's physician.")  When viewed with a deferential eye, the lack of objective documentation that would sufficiently establish the severity and frequency of Mr. Badawy's attacks leads the Court to conclude that it was not arbitrary and capricious for First Reliance Standard to find that Mr. Badawy was not totally disabled in that he has "failed to provide satisfactory proof of his inability to perform the material duties of his regular occupation" (AR 36.)

**B.        Partial Disability**

While the Court has concluded that First Reliance Standard's finding as to total disability was not arbitrary and capricious, there remains the issue of whether Mr. Badawy was partially disabled, and, if partially disabled, whether he would be entitled to the same benefits.  These issues arise because the definition of total disability under the Plan appears to *include* persons with a partial (or residual) disability.  The Plan's full definition of Total Disability follows:

> "Totally Disabled" and "Total Disability" mean, that as a result of an Injury or Sickness, during the Elimination Period and thereafter an insured cannot perform the material duties of his/her regular occupation;
> (1) "Partially Disabled" and "Partial Disability" mean that as a result of an Injury of Sickness an Insured is capable of performing the material duties of his/her regular occupation on a part-time basis or some of the material duties on a full-time basis. An insured who is Partially Disabled will be considered Totally Disabled, except during the Elimination Period; and
> (2) "Residual Disability" means being Partially

> Disabled during the Elimination Period. Residual Disability
> will be considered Total Disability. (AR 8.)

Read literally, sub-paragraph one (1) appears to extend benefits to persons who become partially disabled *after* a 90 day Elimination Period during which no benefits are paid. Sub-paragraph two (2) further extends coverage to persons who are partially disabled *during* the Elimination Period by equating "partial disability" with "residual disability," which in turn is equated with "total disability."

This is not the first time that the scope of the Plan's coverage has been subject to judicial review. Confronted with the identical language, Judge O'Toole found its meaning to be plain and unambiguous, if somewhat curious. *See Conrad v. Reliance Standard Life Ins. Co*., 292 F.Supp.2d 233, 236 (D. Mass. 2003) ("While it is puzzling that the Plan would use such complicated verbiage to establish that the same benefits will be awarded whether a person is totally or partially disabled, this seems to be the straightforward meaning of the language cited above.") While counsel in the present case failed to bring the *Conrad* opinion to the Court's attention, the Court notes that First Reliance Standard's counsel in *Conrad* conceded that Judge O'Toole's reading of the clause was correct. (*Id*.)

Both at oral argument and in its Sur-Reply Memorandum, defendant appeared to acknowledge that the possession of a partial disability may qualify a claimant as totally disabled under the Plan. However, defendant offers two reasons why coverage was nevertheless denied here. First, defendant disputes that Mr. Badawy is partially disabled, reasoning that, even if his attacks were so severe as to cause nine workdays of disability per month, he would still be able to work full-time for eleven workdays per month.

According to defendant, assuming one attack per week for three out of four weeks a month, Mr. Badawy could still work "a full uninterrupted week" at least once a month. (D. Sur-Reply, p. 5.) Defendant then points to the Plan's definition of "full-time," which means "working … for a minimum of 30 hours during a person's regular work week." (*Id.*) The Sur-Reply does not elaborate on the point, but it appears that defendant intends the Court to infer that, because Mr. Badawy can meet the definition of "full-time" for one week a month at the least, he does not fall within the definition of partial disability under the Plan (i.e., "capable of performing the material duties of his/her regular occupation on a part-time basis.") (AR 8.)

Second, defendant contends that the possession of a disability, during the ninety day Elimination Period, that only incapacitates a claimant for nine or ten days each month would not qualify said individual as partially disabled. According to defendant, one must be able to work some part of every day, or work all day (and every day) while being unable to perform every duty, in order to satisfy the Elimination Period using the residual disability / partial disability provision. Under this view, a claimant who possessed an illness of intermittent manifestation so severe as to preclude him or her from work on the vast majority (but not all) days would still not be able to meet this definition of partial disability. (D. Sur-Reply, pp. 5-6.)

Defendant makes no careful analysis of either the language within the Plan or analogous case law, however, in order to support these twin conclusions. Moreover, and more importantly, there is absolutely nothing in the Administrative Record that reflects that the claims administrators at First Reliance Standard ever examined Mr. Badawy's claim with an effort to determine whether he was partially (or residually) disabled, and if

partially (or residually) disabled, whether he would be entitled to benefits. While courts "are not free to substitute [their] own judgment for that of the [plan decisionmaker] as if [they] were considering the issue of eligibility anew," *Pagan v. NYNEX Pension* Plan, 52 F.3d 438, 442 (2d Cir. 1995), Mr. Badawy's eligibility for benefits under the full definition of total disability—that is, including partial and residual disability—went unconsidered by First Reliance Standard. Thus, there was no "rational interpretation of the Plan's provisions" here to which the Court can defer. *Celardo v. GNY Automobile Dealers Health & Welfare* Trust, 318 F.3d 142, 146 (2d Cir. 2003).

Despite the plain language of the Plan, it is clear from a review of the Record that First Reliance Standard held Mr. Badawy to a higher standard of total disability, inquiring only as to whether he could not "perform the material duties of his/her regular occupation," and did not consider whether he qualified as partially or residually disabled. References abound to Mr. Badawy's failure to meet a standard unnecessarily higher than that actually required by the plain language of the total disability clause. A September 29, 2000 document entitled "Appeal / ERISA Appeal Referral," apparently written during the period First Reliance Standard was reconsidering its initial denial of Mr. Badawy's claim based on a pre-existing condition, contains the notation, "41 Yr-old Foreign Exchange Broker w/ lifelong condition … Total disability also very questionable for period claimed." (AR 264, emphasis in original.)

The March 12, 2001 report of registered nurse Bozena Irish notes that Mr. Badawy's records are "consistent with the nature of FMF pertaining to acute attacks and free of any debilitation [sic] intervals between attacks. In addition … it appears that prophylatic use of Colchicine by Mr. Badawy reduced number of documented attacks."

(AR 187.)  She concludes that Mr. Badawy would not be precluded "from gainful activities on an ongoing basis." (*Id.*)  Two days later, First Reliance Standard Life examiner Robert Rose wrote to Mr. Badawy, telling him that, as the medical information "evaluated does not support restrictions/limitations that would preclude [him] from performing the material duties of his occupation as a Foreign Exchange Broker *on a full-time basis*," he thus did not satisfy the "policy definition of Total Disability."  (AR 184-85, emphasis added.)  In examining the language in this denial letter, it is useful to remember the regulatory scheme First Reliance Standard operates under.  ERISA regulates the manner in which an employee benefit plan notifies a claimant of a denial. The plan must "provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the *specific reasons for such denial, written in a manner calculated to be understood by the participant*."  29 U.S.C. § 1133 (emphasis added), *see also* 29 C.F.R. § 2560.503-1(g) (regulations stating that when a claim for benefits is denied, the written notice must provide "[t]he specific reason or reasons for the denial" as well as "*[s]pecific reference to pertinent plan provisions* on which the denial is based." (emphasis added).  If First Reliance Standard indeed deliberated and found that Mr. Badawy failed to meet the total disability definition by failing to meet the definition of "partial disability," the Court would expect such an explanation to be set forth clearly in the denial letter.  It is apparent that this conclusion rests only upon the language in the definition of total disability that appears before the (1) in the clause, and ignores the remainder.

Mr. Rose's January 11, 2001 notes on the file further reflect the mistaken belief on the part of the claim administrators that it is only total disability as defined in the first

sentence of the definitional clause that will qualify a claimant as totally disabled. "However, condition per Med Sources is <u>chronic</u> w/ attacks … not t disabled?  We must determine if the claimant was <u>totally disabled</u>, as defined."  (AR 2.)  It strains credulity, and First Reliance Standard does not argue the point, to assume that Mr. Rose was using the phrase "total disability" in this context to refer to both total and partial disability.

In March 30, 2001 notes referencing Mr. Badawy's appeal, the reason given for the original denial of the claim is that Mr. Badawy was "not totally disabled from own occ. based on medical information received and evaluated."  (AR 162.)  Dr. Hauptman's second report also admits that Mr. Badawy's records indicate that he suffers impairment at least periodically (AR 136), though the severity and frequency of this impairment is disputed.

The letter advising of First Reliance Standard's denial of Mr. Badawy's appeal clearly rests on Mr. Badawy's apparent failure to meet only the definition of total disability that appears in the first sentence of the definitional clause.  Though the letter contains a recitation of the full definitional language at the beginning, and at oral argument, defendant's counsel argued that such a *pro forma* recitation is the "best evidence" of the specific reasons behind a denial, the letter tells Mr. Badawy's attorney that he "has failed to provide satisfactory proof of his inability to perform the material duties of his regular occupation" (AR 36); that the "records did not support the claimed level of frequency and severity of attacks alleged by your client," (AR 37); that "work would not have been precluded beyond January 28, 2000" (AR 38); and that "the occupation can be performed with a couple of absences per month … Query why he could not continue to perform the duties of his regular occupation while potentially

missing some work due to attacks as he had done in the past." (AR 38.) This language indicates that First Reliance Standard's denial of benefits did not consider whether Mr. Badawy was not capable of performing the material duties of his regular occupation on a part-time basis or some of the material duties on a full-time basis, and, further, whether such partial or residual disability entitled the claimant to benefits under the Plan.

From a review of the Administrative Record, it is clear that it was mainly the disputed frequency and intensity of Mr. Badawy's attacks, and not the complete lack thereof, that led to the conclusion that he was not totally disabled. Thus, the Court finds that First Reliance Standard's decision to deny Mr. Badawy's claim based on his failure to meet the definition of total disability, without full and fair consideration of whether he qualified for coverage based on partial or residual disability, was arbitrary and capricious as a matter of law.

**APPROPRIATE REMEDY**

In holding that First Reliance Standard's decisionmaking here was arbitrary and capricious, the Court does not find that "a reasonable fiduciary could only have granted the claim." *Miller v. United Welfare Fund*, 72 F.3d 1066, 1073-74 (2d Cir. 1995). Nor does the Court find that Mr. Badawy's claim necessarily should have been granted. *See Maida v. Life Ins. Co. of North America*, 949 F.Supp. 1087, 1093 (S.D.N.Y. 1997). Remand here, however, would not be a "useless formality," *Miller* at 1071, as the evidence supporting Mr. Badawy's claim was never analyzed with an eye as to whether or not he was partially disabled. Therefore, this Court remands to First Reliance Standard, the claims review fiduciary, with the instruction that Mr. Badawy's application,

along with any additional evidence he wishes to submit, be reconsidered as to whether he meets the definition of total disability via meeting the definition of partial disability, and, if so, whether he is otherwise entitled to benefits under the Plan.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment [10] is granted to the extent that defendant's determination is vacated, and the case is remanded to First Reliance Standard for reconsideration, but is otherwise denied. Defendant's motion for summary judgment is denied. This court shall retain jurisdiction of this matter, but the Clerk of the Court is directed to close this case for administrative purposes unless restored to the active calendar on motion of any party.

SO ORDERED.

Dated: New York, New York
      September 28, 2005

Richard J. Holwell
United States District Judge